**FILED**
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

**MAY 1 8 2005**

JAMES W. McCORMACK, CLERK
By:_____
DEP CLERK

JAMES JOHNSON
aka Seifullah Aziz Ali Diaab
ADC #86885

PLAINTIFF

V.                                5:03CV00468 JLH/JTR

GREGORY HARMON, Warden,
Arkansas Department of Correction, et al.                    DEFENDANTS

## PROPOSED FINDINGS AND RECOMMENDED DISPOSITION

### I. Introduction

Plaintiff, James Johnson aka Seifullah Aziz Ali Diaab, a prisoner currently incarcerated in the East Arkansas Regional Unit of the Arkansas Department of Correction ("ADC"), filed this § 1983 action against eleven named Defendants, each of whom allegedly violated Plaintiff's constitutional rights. On May 5, 2005, the Court conducted a one-day Evidentiary Hearing on the merits of these claims, which are summarized below:

(1) On March 20, 2002, Plaintiff's cell in the Tucker Maximum Security Unit ("TMSU") was searched for contraband. After guards found two $10.00 bills and 6 cents in change, Defendant John Kleiner, a TMSU field major, ordered that Plaintiff be placed in punitive isolation for five days, without any hearing, thereby depriving Plaintiff of his liberty without due process of law.

(2) After finding the aforementioned contraband, Defendant Kleiner ordered the searching officers to open all of the individually packaged food items in Plaintiff's cell, which caused those items to become stale and inedible. Defendant Gregory Harmon, the Warden of TMSU, denied Plaintiff's grievance challenging Defendant Kleiner's order to open these food items, and Defendant Ray Hobbs,

**110**

the Chief Deputy Director of the ADC, affirmed Defendant Harmon's denial of that grievance. Plaintiff contends this conduct by Defendants Kleiner, Harmon, and Hobbs denied him his personal property (the spoiled food items), without due process of law.

(3)     On March 25, 2002, Plaintiff appeared before Hearing Officer Justine Minor for a disciplinary hearing arising from the March 20 search. Pursuant to Plaintiff's interpretation of the applicable ADC regulations governing disciplinary hearings, he requested that Defendant Minor consider the actual contraband seized during the March 20 search of his cell, *i.e.* the two $10.00 bills, rather than a photocopy of that evidence. According to Plaintiff, Defendant Minor's decision to consider a photocopy of the contraband, instead of the contraband itself, denied him procedural due process. Because Defendants Harmon, Robert Clark, the ADC's Internal Affairs Administrator, and Larry Norris, the Director of the ADC, later denied Plaintiff's appeal of this disciplinary conviction, they also violated his right to procedural due process.

(4)     On June 12, 2002, Plaintiff's cell at the TMSU was again searched for contraband. Officers found two $100.00 bills, four packages of Bugle brand smoking tobacco, and nine containers of "hooch."[1] According to Plaintiff, Defendant Verna Kelly, one of the officers conducting the search, kept the two $100.00 bills and denied Plaintiff's request to send the money to a third party outside the prison. Defendant Harmon denied Plaintiff's grievance against Defendant Kelly, and Defendant

---

[1]During the Evidentiary Hearing, witnesses testified that "hooch" is the name given to homemade alcohol, which usually is made from the juice that prisoners receive with their breakfasts.

Hobbs affirmed Defendant Harmon's denial of the grievance. Plaintiff contends this conduct by Defendants Kelly, Harmon, and Hobbs denied him of his personal property (the two $100 bills), without due process of law.

(5)     On June 17, 2002, Plaintiff appeared before Hearing Officer Keith Waddle for a disciplinary hearing arising from the June 12 search. Pursuant to Plaintiff's interpretation of the applicable ADC regulations governing Disciplinary Hearings, he requested that Defendant Waddle consider the actual contraband that was seized during the June 12 search of his cell, rather than photocopies of that contraband. Defendant Waddle denied this request and considered photocopies of the two $100.00 bills and a photocopy of a photograph of the four packages of tobacco and nine containers of hooch. According to Plaintiff, this decision by Defendant Waddle denied him procedural due process. Because Defendants Harmon, Clark, and Norris later denied his appeal of this disciplinary conviction, they also violated his right to procedural due process.

(6)     On June 21, 2002, Plaintiff was transferred to the Varner Super Max Unit ("VSM"). Upon arrival at VSM, Defendant Faseeia Preston improperly inventoried Plaintiff's personal property. Several weeks later, in arranging to have his personal property shipped to his two brothers, Plaintiff discovered that his Sony radio, headphones, gym shoes, cologne, and other personal items had been lost or stolen. Plaintiff filed a grievance based on Defendant Preston's improper inventory of his property. Defendant Rick Toney, the Warden of VSM, denied this grievance, and that decision was affirmed by Defendant Hobbs. According to Plaintiff, this conduct by Defendants Preston, Toney, and Hobbs resulted in his

personal property being confiscated without due process of law.

(7)     Defendant Toney is responsible for the implementation and supervision of the incentive level program at VSM. According to Plaintiff, this incentive level program violated his rights under the equal protection clause because it allowed inmates at higher incentive levels to receive more privileges than inmates at lower incentive levels.

(8)     Plaintiff is a Muslim and a member of the Nation of Islam. In addition to participating in the required fast of Ramadan, Plaintiff voluntarily fasts from sunrise to sunset on every Monday and Thursday and on the 13th, 14th, and 15th of each month. On September 3, 2002, Defendant Toney received Plaintiff's written request that he be provided a meal tray, after sunset on his voluntary fasting days, or be allowed to purchase and keep food from the commissary in his cell in order to accommodate the free exercise of his religion.[2] Defendant Toney denied this request and later denied a grievance raising the same issue. Defendant Hobbs affirmed Defendant Toney's decision denying the grievance. Plaintiff alleges that the decision by Defendants Toney and Hobbs, to deny his request for a religious accommodation, violated his first amendment right to freely exercise his religion.

(9)     Defendant Charles Freyder, a non-denominational Chaplain at VSM, violated Plaintiff's right to freely exercise his religion by denying his request to receive a special meal tray on Eid-ul-Fitr Feast, which celebrates the breaking of the Fast

---

[2]Between June 21, 2002, and November 11, 2002, Plaintiff was classified as "incentive level 1," a designation that prohibited him from purchasing food items from the commissary. Plaintiff acknowledges that, on November 12, 2002, he graduated to "incentive level 2" and was permitted to purchase food from the commissary to keep in his cell. During the Evidentiary Hearing, Plaintiff acknowledged that this free exercise claim arose on September 3, 2002, and was extinguished on November 12, 2002, the date Plaintiff was elevated to incentive level 2.

of Ramadan.

By way of relief, Plaintiff seeks monetary damages for each of the alleged violations of his constitutional rights. *See* Plaintiff's Complaint (docket entry #2).

During the May 5 Evidentiary Hearing, Plaintiff testified and called one witness, inmate Eddie Briley. Plaintiff also introduced into evidence Plaintiff's Exhibits 1 through 15. Each of the eleven Defendants also testified, as well as two non-party witnesses, Rena Harrison, the Business Manager at TMSU, and Chaplain Agin Muhammad, the Coordinator of Islamic activities at the ADC. Defendants also introduced into evidence Defendants' Exhibits 1 through 23, 25, and 29.[3]

## II. Findings of Fact and Conclusions of Law

**A.     Plaintiff's Claims Against Defendants Kleiner, Harmon, and Hobbs Arising From the March 20, 2002 Search of His Cell at TMSU**

1.     Plaintiff testified that, immediately after guards discovered the two $10.00 bills in his cell on March 20, 2002, Defendant Kleiner ordered Plaintiff to be taken to punitive isolation until his Disciplinary Court Review ("DCR"), which took place five days later on March 25, 2002. According to Plaintiff, holding him in punitive isolation for five days, without a pre-punishment hearing, violated his right to procedural due process.

2.     In *Stevens v. McHan*, 3 F.3d 1204, 1206 (8th Cir. 1993), the Court recognized that, "[w]hen an inmate is deprived of privileges or placed in a special confinement status in order to punish him for past misconduct, then due process requires some kind of hearing beforehand." However, the Court also noted that, if the prisoner is placed in special confinement for permissible administrative purposes, then his liberty interests are not implicated and due process

---

[3]Counsel for Defendants placed these exhibits in a well-organized notebook, which the Court found extremely useful during the Evidentiary Hearing and in preparing this Recommended Disposition.

considerations do not attach. *Id.*

3.     Defendant Kleiner testified that he ordered Plaintiff to be placed in *administrative segregation*, in the west isolation wing, to await his DCR—*not* punitive isolation. According to Defendant Kleiner, the east and west isolation wings house two categories of prisoners: (a) those who have been sentenced by a hearing officer to punitive isolation for a disciplinary conviction; and (b) those who have been placed in administrative segregation awaiting their DCR. Defendant Kleiner stated that prisoners who are being held in punitive isolation are not allowed to take any of their personal property into their cells, while prisoners held in the administrative segregation in the isolation wings are allowed to take all of their personal property into their cells.

4.     Importantly, Defendant Kleiner testified that, when Plaintiff was transferred to administrative segregation in the west isolation wing, he was allowed to take all of his personal property with him. Plaintiff admitted that, after Defendant Kleiner ordered him to be incarcerated in the isolation wing, he was allowed to take all of his personal property from his cell in Barracks 9[4] to his new cell. Plaintiff also admitted that, after his disciplinary conviction on March 25, 2002, he was sentenced to punitive isolation. This time, Plaintiff acknowledged that he was *not* permitted to take any personal property with him to the punitive isolation cell.

5.     Defendant Kleiner explained the policy behind prisoners being placed in administrative segregation in the isolation wing after contraband is discovered in their cells. According to Defendant Kleiner, guards or other prisoners with access to a particular barracks are often involved in supplying a prisoner with contraband. By placing the prisoner in administrative

[4]Barracks 9 at the TMSU is an administrative segregation barracks that houses prisoners who have broken prison regulations and lost their privilege to be housed in the general population. Thus, at the time contraband was found in Plaintiff's cell on March 20, 2002, he was already in an administrative segregation barracks. As explained by Defendant Kleiner, this meant administrative segregation in one of the isolation wings was the only remaining option.

segregation, in the most secure area of the prison, his access to contraband is stopped, while prison officials investigate the source of the contraband.

6. The Court finds that, after contraband was discovered in his cell on March 20, 2002, Defendant Kleiner ordered Plaintiff to be held in administrative segregation–*not* punitive isolation–for five days awaiting his DCR. The purpose for this administrative segregation was to ensure that Plaintiff did not continue to have access to contraband that might jeopardize the safety and security of the prison or otherwise interfere with the prison officials' investigation of the source of the contraband–and not to "punish" him prior to a disciplinary hearing. The fact that Defendant Kleiner allowed Plaintiff to take his personal property with him to his cell in the west isolation wing is compelling evidence that he was being held in administrative segregation–*not* punitive isolation.

7. Finally, it should be noted that the Eighth Circuit decided *Stevens v. McHan*, 3 F.3d 1206, two years *before Sandin v. Connor,* 515 U.S. 472, 484 (1995). In *Sandin,* the Court held that a prisoner does *not* have a liberty interest at stake, when being confined in administrative segregation or punitive isolation, unless the confinement is deemed an "atypical or significant hardship . . . in relation to the ordinary incidence of prison life." *Id., see also Portley-El v. Brill,* 288 F.3d 1063, 1065-66 (8th Cir. 2002) (*thirty days* in punitive segregation did not trigger a due process liberty interest under *Sandin*); *Wycoff v. Nichols,* 94 F.3d 1187, 1189-90 (8th Cir. 1996) (no liberty interest arising where prisoner served *forty-five days* in administrative segregation before disciplinary decision was reversed); *Hemphill v. Delo,* Case No. 95-3357, 1997 WL 581079 (8th Cir. Sept. 22, 1997) (unpublished decision) (*four days* of lockdown, *thirty days* in disciplinary segregation, and *290 days* in administrative segregation was not an "atypical and significant hardship" when compared to the burdens of ordinary prison life); *Driscoll v.*

*Youngman*, Case No. 95-4037, 1997 WL 581072 (8th Cir. Sept. 22, 1997) (unpublished decision) (*135 days* in disciplinary and administrative segregation, without meaningful exercise, natural light and adequate library access, not an atypical and significant hardship") (emphasis added). Thus, even if Defendant Kleiner had ordered Plaintiff to be held in punitive isolation for five days, he had no liberty interest at stake capable of supporting a due process claim under *Sandin*.

8. Plaintiff also testified that, after guards found the two $10.00 bills during the March 20, 2002 search of his cell, Defendant Kleiner ordered them to open all of the individually wrapped food items in Plaintiff's cell, which caused those food items to spoil. Plaintiff estimated that the destroyed food items, which included Little Debbie Cakes, Ramen Noodles, and crackers, had a value of approximately $30.00. Plaintiff did not call as witnesses any guards or prisoners to support his testimony that, after the search, opened food items littered his cell.

9. Defendant Kleiner testified that, after the two $10.00 bills were discovered, he ordered the guards to open and search the boxes that contained the individually wrapped food items but did *not* order that any individually wrapped food items be opened. Defendant Kleiner explained that a guard would only be justified in opening an individually wrapped food item if he saw a hole in the wrapper sufficient to create a "reasonable suspicion" that contraband might be hidden inside. Because none of the individually wrapped food items showed signs of having been tampered with, Officer Kleiner testified that they were *not* opened.

10. The Court has serious doubts about Plaintiff's version of these facts. If $30.00 worth of individual Little Debbie Cakes, Ramen Noodles, and the other similarly described food items had been opened, Plaintiff's cell would have been littered with close to fifty opened packages of food. Furthermore, all of those allegedly opened food items were later transported to Plaintiff's new cell in the west isolation wing. This strongly suggest that fellow prisoners

encountered along the way to the isolation wing and the guards in the isolation wing would have seen and remembered such a large number of opened food items. Yet, Plaintiff failed to call any witnesses to support his version of what happened during the March 20, 2002 search of his cell.

11. Defendant Kleiner offered credible testimony, and the Court credits his version of the facts. Thus, the Court finds that Plaintiff has failed to prove by a preponderance of the evidence that, during the March 20, 2002 search, Defendant Kleiner ordered other guards to open all of the individual packages of food in Plaintiff's cell.

12. Finally, even if the Court were to credit Plaintiff's version of these facts, his claim against Defendant Kleiner would fail, as a matter of law. In *Hudson v. Palmer*, 468 U.S. 517, 533 (1984), the Court held that:

> [A]n unauthorized intentional deprivation of property by a state employee does not constitute a violation of the procedural requirements of the Due Process Clause of the Fourteenth Amendment if a meaningful postdeprivation remedy for the loss is available. For intentional, as for negligent deprivations of property by state employees, the state's action is not complete until and unless it provides or refuses to provide a suitable postdeprivation remedy.

Consistent with *Hudson*, in *Williams v. Campbell*, Case No. 00-3699, 2001 WL 1549545 (8ᵗʰ Cir. Dec. 6, 2001) (unpublished opinion), the Court held that the defendants' failure to return the property they seized during a search of a prisoner's cell did not violate the Fourteenth Amendment because Arkansas law provided an adequate post-deprivation remedy, *i.e.*, the prisoner could have filed a claim before the Arkansas Claims Commission pursuant to Ark. Code Ann. § 19-10-204(a). Likewise, in *McDowell v. Jones*, 990 F.2d 433, 434 (8ᵗʰ Cir. 1993), the Eighth Circuit held that a Missouri prisoner could not raise a § 1983 claim, based upon the seizure and destruction of his property, because the prisoner "could have pursued a state postdeprivation remedy for the conversion of his property."

13. During his testimony, Plaintiff admitted that Defendants Harmon and Hobbs had

no personal involvement with or knowledge of the events surrounding the March 20, 2002 search of his cell. Rather, their alleged liability arises solely from their decision to deny Plaintiff's grievance concerning Defendant Kleiner's alleged misconduct in connection with the search. Because the Court finds that Defendant Kleiner did not violate Plaintiff's due process rights, there is no factual or legal basis for Plaintiff's claim that, in denying his grievance against Defendant Kleiner, Defendants Harmon and Hobbs also violated his due process rights.

14. Thus, based upon the foregoing findings, the Court recommends that Plaintiff's claims against Defendants Kleiner, Harmon, and Hobbs, arising from the March 20, 2002 search of Plaintiff's cell in TMSU, be dismissed, with prejudice.

**B.** **Plaintiff's Claims Against Defendants Kelly, Harmon, and Hobbs Arising From the June 12, 2002 Search of His Cell at TMSU.**

1. Plaintiff acknowledged that, during the June 12, 2002 search of his cell, Defendant Kelly found two $100.00 bills, four quarters, four packages of Bugle brand smoking tobacco, and nine containers of hooch. Plaintiff also admitted that all of the foregoing items constitute contraband that prisoners are not allowed to keep in their cells.

2. According to Plaintiff, Defendant Kelly: (a) refused his request to send the two $100.00 bills to a third-party outside prison; and (b) kept the $200.00 for herself. Defendant Harmon later denied Plaintiff's grievance complaining about Defendant Kelly's conduct, and Defendant Hobbs affirmed Defendant Harmon's decision. Plaintiff admits that Defendants Harmon and Hobbs had no personal knowledge of or involvement in the June 12 search of his cell and that their alleged liability arises solely from their decisions denying his grievance complaining about Defendant Kelly's conduct.

3. Defendant Kelly testified that, after she seized the two $100.00 bills in Plaintiff's cell on June 12, 2002, she immediately turned them over to Sergeant Ivy and this was the last time

she saw the money. She flatly denied Plaintiff's allegation that she stole the $200.00.

4.      Rena Harrison, the Business Manager at TMSU, testified that it is ADC policy to deposit all money confiscated from prisoners as contraband into the ADC inmate welfare account. The funds in that account are used exclusively to pay for: (a) recreational items for prisoners; (b) expenses associated with prisoner sponsored activities; and (c) other appropriate prisoner welfare activities. Ms. Harrison testified that she personally deposited into the inmate welfare account the $201.00 confiscated from Plaintiff. Defendants' Exhibit 5 is the "deposit ticket" reflecting that, on June 13, 2002, $201.00 in "confiscated money" in the possession of "Johnson" was deposited into the ADC's "inmate account" at Simmons First National Bank. Defendant's Exhibit 4 is the Simmons First Deposit Receipt documenting receipt of the $201.00 into the inmate welfare account.

5.      In *Bell v. Wolfish*, 441 U.S. 520, 554 (1979), the Court recognized that the "due process rights of prisoners and pretrial detainees [against the deprivation of property without due process of law] are not absolute; they are subject to reasonable limitation or retraction in light of the legitimate security concerns of the institution." In *Lyon v. Farrier*, 730 F.2d 525, 527 (8th Cir. 1984), the Court applied *Bell* to reject a prisoner's claim that personal property in his cell was destroyed by guards without due process: "Because the property was contraband, [the prisoner] cannot seriously argue that he had a protected property interest in it."

6.      The evidence overwhelmingly establishes that, after Defendant Kelly properly seized the $201.00 in contraband from Plaintiff's cell, it was properly deposited in the inmate welfare account, pursuant to ADC policy. The Court also finds that the ADC policy prohibiting prisoners from having money in their cells arises from compelling and legitimate security concerns. Because the money seized in Plaintiff's cell was contraband, he had no protected

property right or interest in it. Therefore, he had no standing to request that Defendant Kelly send the contraband to a third-party outside prison.

7.     Because Plaintiff has failed to prove by a preponderance of the evidence his procedural due process claims against Defendants Kelly, Harmon, and Hobbs, the Court finds those claims to be without merit and recommends that they be dismissed, with prejudice.

**C.     Plaintiff's Claims Against Defendants Minor, Waddle, Harmon, Clark, and Norris Arising from Plaintiff's Disciplinary Convictions on March 25, 2002, and June 17, 2002**

1.     ADC Administrative Directive 831 (*see* Defendants' Exhibit No. 19) sets forth the rules and procedures governing major Disciplinary Court Hearings. Section VI, J.(3) of that Directive addresses the procedure that Disciplinary Hearing Officers should follow in considering "contraband and other physical evidence" which may be relevant to the outcome of a disciplinary hearing:

> If physical evidence is involved in or crucial to the determination to be made by the Disciplinary Hearing Officer (such as weapons or contraband), then that evidence will be presented to and considered by the hearing officer. The general policy is that in any instance where there is any form of physical evidence, such evidence should be presented to the hearing officer. In cases where it is administratively burdensome to present such evidence, (such as drugs or quantities of perishable items), either a photograph of the evidence or a lab/written report indicating the exact nature of the evidence must be presented. In no case will an inmate be found guilty of possession of contraband or fighting with or possessing a weapon unless the hearing officer has before him/her either the actual evidence in question, a photograph of said evidence, or a lab/written report indicating that the substance is in fact contraband.

2.     Plaintiff testified that he interprets Section VI, J.(3) to mean that Defendant Minor was required to consider the actual contraband seized during the search of his cell on March 20, 2002—the two $10.00 bills—rather than photocopies of that currency. Likewise, Plaintiff contends that Defendant Waddle was required to consider the actual contraband seized during the June 12, 2002 search of his cell—two $100.00 bills, four packages of tobacco, and nine contains of

hooch—rather than a photocopy of the two $100.00 bills and a photocopy of a photograph of the four packages of tobacco and nine containers of hooch.

3. Defendant Minor testified that, at the beginning of the March 25, 2002 Disciplinary Hearing, Plaintiff requested her to consider the two seized $10.00 bills, rather than a photocopy of the two bills. She recessed the hearing to try to locate the actual currency and was advised that it was locked up in Defendant Harmon's safe. She was also advised that Defendant Harmon had gone for the day, and that no one else at TMSU could open his safe. Defendant Minor returned to the hearing, advised Plaintiff of these facts, and told him that she intended to rely on the photocopy of the two $10.00 bills. During the Evidentiary Hearing, Defendant Minor testified that she reached this decision because she believed it was "administratively burdensome," within the meaning of Section VI, J.(3), for her to postpone the Disciplinary Hearing, until the next time she was scheduled to return to the TMSU, just to satisfy Plaintiff's request that she base her decision on the actual currency, rather than a clear and legible photocopy of the currency. The photocopy of those two $10.00 bills was introduced into evidence during the Evidentiary Hearing as Defendants' Exhibit 21(b). Importantly, the serial numbers on the currency depicted in Defendants' Exhibit 21(b) are identical to the serial numbers listed on the confiscation form describing the items that were seized from Plaintiff's cell during the March 20, 2002 search. During the Evidentiary Hearing, a copy of that confiscation form, marked Defendant's Exhibit 1, was introduced into evidence.

4. Defendant Waddle testified that, at the beginning of the June 17, 2002 Disciplinary Hearing, Plaintiff also requested him to consider the actual contraband seized during the June 12, 2002 search of Plaintiff's cell, rather than photocopies of the two $100.00 bills and a photocopy of a photograph of the four packages of tobacco and nine containers of hooch. These photocopies

of the June 22 contraband were introduced into evidence during the Evidentiary Hearing as Defendants' Exhibits 23(b), 23(c), 23(d), and 23(e). Again, the serial numbers on the currency depicted in Defendants' Exhibit 23(c) are identical to the serial numbers listed on Defendants' Exhibit 2, which is the confiscation form describing the items that were seized from Plaintiff's cell during the June 12, 2002 search.

5.      Defendant Waddle explained that he considered photocopies of the contraband, rather than the contraband itself, because tobacco and hooch are analogous to "drugs" under Section VI, J.(3) and hooch can explode if it is allowed to continue to ferment after it is seized. Therefore, he indicated that it is ADC policy to photograph tobacco and hooch promptly after it is seized and then immediately dispose of that contraband. Finally, Defendant Waddle stated that, because TMSU Business Manager Rena Harrison had deposited the two $100.00 bills into the ADC's inmate welfare account on June 13, 2002, it was impossible for him to consider the actual currency at the June 17 disciplinary hearing. Based upon these facts, Defendant Waddle testified that he was authorized by Section VI, J.(3) to consider legible photocopies of the front and back of the two $100.00 bills, and a legible photocopy of a photograph that clearly depicted the four packages of Bugle brand tobacco and the nine containers of hooch. Therefore, during the June 17 disciplinary hearing, Defendant Waddle denied Plaintiff's request that he consider the actual items of contraband seized from Plaintiff's cell.

6.      The Court finds that, because the actual contraband was unavailable to Defendant Minor, the "administratively burdensome" exception applied and allowed her to consider photocopies of the two $10.00 bills in reaching her decision. Furthermore, the Court finds that, even if the "administratively burdensome" exception did not apply, the next sentence of Section VI, J.(3) would have authorized Defendant Minor to base her decision upon a "photograph of said

evidence . . . ." The Court finds that a clearly legible photocopy of two $10.00 bills serves essentially the same purpose as a photograph of that currency. For the same reasons, the Court finds that Section VI, J.(3) also authorized Defendant Waddle to consider legible photocopies of the two $100.00 bills and a legible photocopy of the photograph of the tobacco and hooch.

7. In essence, Plaintiff is seeking to elevate an, at best, hyper-technical violation of an ADC Administrative Regulation to a matter of constitutional dimension capable of supporting a procedural due process claim. It is well settled that a prisoner does not have a constitutional right "in having state officers follow state law or prison officials follow prison regulations." *Phillips v. Norris*, 320 F.3d 844, 847 (8th Cir. 2003); *see also Kennedy v. Blankenship*, 100 F.3d 640, 643 (8th Cir. 1996). Thus, even if there was a technical violation of Section VI, J.(3) of the ADC's Administrative Directive, the Court concludes, as a matter of law, that it failed to rise to the level of constitutional dimensions capable of supporting Plaintiff's procedural due process claim against Defendants Minor and Waddle.

8. In his testimony, Plaintiff admitted that: (a) Defendants Harmon, Clark, and Norris had no personal knowledge of or involvement in the March 25 and June 17 Disciplinary Hearings; and (b) his due process claims against these three Defendants were based entirely on the fact that they each denied Plaintiff's appeals of his convictions in those two Disciplinary Hearings. Based on the Court's finding that Defendants Minor and Waddle did not violate Plaintiff's right to procedural due process by considering photocopies of the seized contraband, Plaintiff's derivative due process claims against Defendants Harmon, Clark, and Norris also fail.

9. Thus, based on the foregoing findings, the Court recommends that Plaintiff's claims against Defendants Minor, Waddle, Harmon, Clark, and Norris, arising from the March 25 and June 17, 2002 Disciplinary Hearings, be dismissed, with prejudice.

**D. Plaintiff's Due Process Claims Against Defendants Preston, Toney, and Hobbs Arising From His Personal Property Being Lost or Stolen After His Transfer to VSM**

1. On June 21, 2002, Plaintiff was transferred from TMSU to VSM. According to Plaintiff, he arrived at VSM with five bags of personal belongings. VSM does not allow prisoners to keep any of their personal belongings, other than certain specified religious texts. Therefore, all prisoners are required to surrender their personal property after it has been inventoried by a guard. Prisoners are given a copy of the guard's inventory log describing each item of their personal property and must advise prison officials, within a specified number of days, of where they wish to have their personal belongings shipped. Prisoners who fail to provide shipping instructions, within the specified time period, have their personal property given to charity.

2. Plaintiff gave vague and confusing testimony describing how his personal property was improperly inventoried and later lost or stolen. According to Plaintiff, Officer Swopes began to inventory his personal property but went off duty and turned the job over to Defendant Preston. According to Plaintiff, Defendant Preston failed to properly inventory all of his personal property.

3. The two-page inventory of Plaintiff's personal property, marked Defendants' Exhibit 7, was introduced into evidence during the Evidentiary Hearing. Both pages of this document are signed by Plaintiff and by Officer Swopes, as the person who inventoried Plaintiff's property. In his testimony, Plaintiff admitted that he was given a copy of the fully-executed inventory, which bears his signature and the signature of Officer Swopes.

4. Defendant Preston's name does *not* appear anywhere on Defendants' Exhibit 7. Plaintiff was unable to explain why, if Defendant Preston had been involved in inventorying his property, she failed to sign that document.

-16-

5.    Plaintiff testified that, on July 25, 2002, Defendant Preston brought the bags of his personal property to his cell so that he could give her instructions on which items should be shipped to his two brothers. According to Plaintiff, as Defendant Preston began to separate the items in the bags, he realized that his Sony radio, headphones, gym shoes, cologne, and various other personal items were missing. Plaintiff testified that Defendant Preston failed to include the missing items on the June 21, 2002 inventory report and suggested that she may have stolen those items. Finally, Plaintiff testified that, although he paid to have the boxes of his belongings shipped to his two brothers, he later learned that they did not receive the boxes containing his personal property.

6.    According to Plaintiff, he filed a claim with the Arkansas Claims Commission seeking to recover the value of his lost or stolen personal property. However, this claim was later denied.

7.    Defendant Preston offered credible and convincing testimony that was in sharp conflict with Plaintiff's version of the facts. According to Defendant Preston, she had no role or involvement in inventorying Plaintiff's personal property when he arrived at VSM on June 21, 2002. Defendant Preston's first involvement with Plaintiff's personal property took place on July 12, 2002, when she sent a memo to Plaintiff advising him that he had until July 29, 2002, to turn in his "form stating the address to whom you are sending [your personal property]," along with a check to cover the shipping costs. *See* Defendants' Exhibit #8.

8.    On July 26, 2002, Defendant Preston brought the bags of Plaintiff's personal property to his cell and, pursuant to Plaintiff's instructions, separated the items in the bags into two piles—one of which was to be shipped to each of Plaintiff's brothers. According to Defendant Preston, she used Officer Swopes' property inventory report to make certain each of the items in

-17-

the bags matched the items listed on the inventory. She testified that all of the items in the bags matched the property inventory and that there were no missing items. Defendant Preston acknowledged that, while she was talking with Plaintiff on July 26, 2002, he complained that some of his personal property was missing. According to Defendant Preston, she advised Plaintiff that he should have brought that issue to Officer Swopes' attention when she inventoried his property on June 21, 2002. On July 31, 2002, Defendant Preston sent Plaintiff a memo confirming what took place during their July 26, 2002 meeting. A copy of that memo, marked Defendants' Exhibit 9, was introduced into evidence during the Evidentiary Hearing. This memo directly supports Defendant Preston's testimony describing what took place on July 26, 2002.

9.   On August 1, 2002, Plaintiff sent Defendant Preston a handwritten note advising her of the addresses of his two brothers: Mr. Vincent Johnson and Mr. Robert Johnson. A copy of that handwritten note, marked Defendants' Exhibit 10, was introduced into evidence during the Evidentiary Hearing. Defendant Preston testified that, on August 1, 2002, she mailed the respective boxes of Plaintiff's personal belongings to Vincent Johnson and Robert Johnson at the addresses Plaintiff provided in Defendants' Exhibit 10. On August 5, 2002, Defendant Preston sent VSM's Assistant Warden a memo documenting the fact that, pursuant to Plaintiff's instructions, she had mailed his personal belongings to his brothers on August 1, 2002. A copy of that memo, marked Defendants' Exhibit 11, was introduced into evidence during the Evidentiary Hearing. A copy of the receipt reflecting that Plaintiff paid the shipping costs, marked Exhibit 12, was also introduced into evidence during the Evidentiary Hearing. Finally, Defendant Preston testified that, after she shipped the boxes of Plaintiff's belongings to his brothers, those boxes were *not* subsequently returned "undeliverable" to VSM's mail room. Thus, Defendant Preston indicated that Plaintiff's brothers must have received the boxes

containing his personal property.

10.     As indicated previously, Plaintiff's testimony regarding his allegedly lost or stolen personal property was vague and difficult to follow. In contrast, Defendant Preston gave coherent and credible testimony. Based on Defendant Preston's testimony, the Court finds that: (a) she had no role or involvement in inventorying Plaintiff's personal property after he arrived at VSM on June 21, 2002; (b) on July 26, 2002, she properly separated all of the items of Plaintiff's personal property into boxes, pursuant to Plaintiff's instructions; and (c) on August 1, 2002, she personally mailed the boxes of Plaintiff's personal property to his two brothers.

11.     During Plaintiff's testimony, he admitted that Defendants Toney and Hobbs had no personal knowledge of or involvement with the inventorying of his personal property, the shipment of his personal property to his brothers, or any items of his personal property becoming lost or stolen. Plaintiff also admitted that his due process claims against Defendants Toney and Hobbs are based solely on their decisions to deny his grievance complaining about Defendant Preston's alleged conduct in inventorying and later losing or stealing items of his personal property.

12.     The Court finds that Plaintiff has failed to prove by a preponderance of the evidence that any of his personal property was improperly inventoried or otherwise lost or stolen after his arrival at VSM on June 21, 2002. Thus, there is no factual basis for his due process claims against Defendants Preston, Toney, and Hobbs arising from the alleged loss of that personal property. Furthermore, as previously explained,[5] even if the Court were to credit Plaintiff's version of the facts involving the alleged loss of his personal property, his procedural due process claims against Defendants Preston, Toney, and Hobbs would still fail, as a matter of

_____

[5]*See* discussion of applicable case law set forth in ¶ 12 on page 9 of this Recommended Disposition.

law.

13.     Because Plaintiff's procedural due process claims against Defendants Preston, Toney, and Hobbs are without merit, the Court recommends that these claims be dismissed, with prejudice.

**E.      Plaintiff's Equal Protection Claim Against Defendant Toney Arising From the Allegedly Unconstitutional Incentive Level Program at VSM**

1.      VSM houses the ADC's most difficult to control prisoners, all of whom are classified as "category 5" prisoners. Upon entering VSM, all prisoners are assigned to incentive level 1. As prisoners work their way up through the incentive levels to incentive level 5, the highest incentive level, their privileges increase with each level. After achieving incentive level 5, prisoners become eligible for transfer back to another ADC facility. *See Proctor v. Toney*, Case No. 02-2788, 2002 WL 31780046 at note 1 (8th Cir. Dec. 11, 2002) (unpublished opinion) ("VSM uses an incentive-level program whereby inmates who demonstrate good conduct are promoted to higher incentive levels with increased privileges until they reach incentive level five, at which time they become eligible for transfer from VSM").

2.      According to Plaintiff, because all prisoners in VSM are "category 5 prisoners," it violated his right to equal protection for prisoners at higher incentive levels to receive more privileges, which were denied to him simply because he was assigned to a lower incentive level. Plaintiff testified that Defendant Toney, as Warden of VSM, was responsible for administering the incentive level program. For that reason, Plaintiff explained that he was asserting his equal protection claim only against Defendant Toney.

3.      Importantly, Plaintiff did not testify that, during the time he was incarcerated at VSM, he was ever treated differently based upon a suspect classification, such as race or religion. Rather, the only disparate treatment he received arose from the incentive level program, which

treated all prisoners at the same incentive level equally but which conferred more privileges on prisoners at higher incentive levels.

4.     Because Plaintiff does not allege that he was treated differently based upon a suspect classification, his equal protective claim must be reviewed under a "rational basis" standard. *Phillips v. Norris*, 320 F.3d 844, 848 (8th Cir. 2003); *Hosna v. Groose*, 80 F.3d 298, 304 (8th Cir. 1996). To prevail under this standard, Plaintiff must prove that Defendant Toney: (a) treated him less favorably than other *similarly situated* prisoners; and (b) had no *rational basis* for subjecting him to dissimilar treatment. *Id.*

5.     Plaintiff acknowledged in his testimony that all prisoners in each incentive level were treated equally. It was only between prisoners at different incentive levels that unequal treatment occurred. On its face, these facts establish that, within the incentive level program, prisoners who are *similarly situated, i.e.* those inmates on the same incentive level, are treated equally. The fact that prisoners on *different incentive levels*–who are *not* similarly situated–are treated differently in no way proves the first essential element of Plaintiff's equal protection claim.

6.     Additionally, Plaintiff failed to prove by a preponderance of the evidence that VSM's incentive level program lacks a rational basis. The Eighth Circuit has previously recognized that VSM's incentive level program is designed to encourage incorrigible or difficult-to-control inmates to abide by prison rules and regulations in order to gain certain privileges as a reward for good behavior. This certainly constitutes a rational basis for the program.

7.     Because Plaintiff's equal protection claim against Defendant Toney is without merit, the Court recommends that it be dismissed, with prejudice.

**F.    Plaintiff's First Amendment Free Exercise Claim Against Defendants Toney and Hobbs**

1.    As indicated previously, Plaintiff is a Muslim and has been a member of the Nation of Islam since 1988. He testified that for the last six years he has fasted from sunrise to sunset on every Monday and Thursday and on the13th, 14th, and 15th of each month. Plaintiff explained that such fasting is not mandated by the Muslim faith but is a voluntary practice he has undertaken to demonstrate his devotion and to atone for his sins. Plaintiff stated that, while he was incarcerated at other ADC units, he was allowed to keep food purchased from the commissary in his cell for consumption after sunset on the days he fasted. However, because he began his incarceration at VSM as an "incentive level one" inmate, Plaintiff was not allowed to keep food items in his cell to consume after sunset on his fasting days.

2.    Accordingly, on August 29, 2002, approximately nine weeks after he began his incarceration at VSM, Plaintiff requested Defendant Toney to allow him, on his fasting days, to either: (a) keep food items purchased from the commissary in his cell for consumption after sunset; or (b) receive his evening meal tray after sunset.[6] *See* Defendants' Exhibit 13. On September 6, 2002, Plaintiff received a written response from Defendant Toney stating that: "I do not find your request to be reasonable or driven by a religious mandate. However you will be given an opportunity to fast. I will make sure Chaplain Muhammad reviews your concerns." *See* Defendants' Exhibit 14.

3.    Plaintiff wrote a grievance regarding the denial of his request for commissary privileges or a post-sunset meal tray. Defendant Toney denied that grievance, and Defendant Hobbs affirmed Defendant Toney's decision on appeal. Accordingly, Plaintiff testified that he

---

[6]All prisoners in VSM receive their meals in their cells. Plaintiff testified that prisoners receive their evening meal trays between 3:00 p.m. and 4:30 p.m.

was wrongfully denied the requested religious accommodation from on or about August 29, 2002, until November 11, 2002, when he achieved "incentive level two," and was allowed to keep food purchased from the commissary in his cell for consumption after sunset.

4. Defendant Toney testified that he denied Plaintiff's request for commissary privileges or a post-sunset meal tray because he had been advised by Chaplain A. Don Yancey, a VSM chaplain, and Iman Agin Muhammad, Sr., the ADC Islamic Coordinator, that Plaintiff's desire to fast numerous times a month was not mandated by his religion. Specifically, Defendant Toney relied upon the September 4, 2002 Memorandum Iman Muhammad sent to Chaplain Yancey, in which Iman Muhammad explained that Plaintiff's fasting was "Nafl" or "voluntary" and "not a requirement" of the Muslim religion. *See* Plaintiff's Exhibit 13.

5. Defendant Toney also explained that Plaintiff's request for commissary privileges would defeat the purpose of the incentive level program, which was to make Plaintiff earn commissary and other privileges by achieving "incentive level two" through good behavior. Defendant Toney further stated that Plaintiff's alternative request for a food tray after sunset was inconsistent with the VSM's usual practice of delivering breakfast trays between 3:30 a.m. and 4:15 a.m., lunch trays at 10:00 a.m., and dinner trays between 3:00 p.m. and 4:30 p.m. Finally, Defendant Toney explained that all VSM meal trays contain medium to large portions, including at least one bread item, and that, on his fasting days, Plaintiff was free to keep any items from his lunch and dinner trays in his cell for consumption after sunset.

6. In response to Defendant Toney's testimony, the Court asked Plaintiff why, on his voluntary fasting days, he did not consider one of the following options: (a) extend his fast from approximately 15 hours (3:30 a.m. to 6:30 p.m. (sunset)) to 24 hours; or (2) simply set aside some of the food from his lunch and dinner trays for consumption after sunset. As to the first option,

-23-

Plaintiff testified that he had tried fasting for 24 hours, but it made him feel nauseated and caused him to lose weight. As to the second option, Plaintiff admitted that he could have saved food from his lunch and dinner meal trays for consumption after sunset. However, Plaintiff claimed that he did not try to do so because he would have been unable to protect his food from the large number of mice in VSM.[7] The Court finds Plaintiff's explanation that he could not defend his food from an alleged onslaught of ravenous mice to be both implausible and disingenuous.

7.    Iman Muhammad's trial testimony was consistent with the information he set forth in his September 4, 2002 Memorandum. Additionally, he explained that, while Muslims are only *required* to fast during the month of Ramadan, many Muslims *choose* to voluntarily fast for additional periods throughout the year. In response to questions from the Court, Iman Muhammad agreed that a Muslim's decision to engage in additional voluntary fasts is analogous to a Catholic's decision to take Communion every day.

8.    To prevail on a claim under the Free Exercise Clause of the First Amendment, an inmate must satisfy a two-part test. *First,* the inmate must satisfy the "threshold" issue of "whether the challenged governmental action infringes upon a sincerely held religious belief." *Murphy v. Missouri Dep't of Corr.,* 372 F.3d 979, 983 (8th Cir. 2004), *cert. denied,* 125 S.Ct. 501 (2004). To satisfy this threshold inquiry, a prisoner has the burden of establishing that: (a) "the alleged religious belief or ritual in question . . . is based on a teaching of the . . . religion"; (b) the inmate's "belief in the teaching is sincerely held"; and (c) the "governmental action in question actually infringes upon the individual prisoner's free exercise of this belief." *Goff v. Graves,* 362 F.3d 543, 547 (8th Cir. 2004). *Second,* the prisoner must demonstrate that the prison regulation restricting his sincerely held religious belief is not "reasonably related to legitimate penological

_____

[7] Plaintiff did not explain how, after he achieved "incentive level 2" on November 12, 2002, he was able to protect his commissary food from similar rodent attacks.

-24-

interests."[8] *Turner v. Safley*, 482 U.S. 78, 89 (1987) (explaining that "[p]rison regulations may infringe upon prisoners' constitutional rights so long as such regulations are reasonably related to legitimate penological interests").

9.      As to the threshold inquiry, the testimony from Plaintiff and Imam Muhammad clearly established that Plaintiff's decision to voluntarily fast several times each month was "based on" Muslim teachings.[9]  Similarly, the Court finds that Plaintiff's beliefs were "sincerely held" because he gave credible and undisputed testimony establishing that he engaged in his voluntary fasting for several years before and after his incarceration at VSM. However, the Court finds that Plaintiff's free exercise claim fails the third part of the threshold analysis (as to whether the government action actually infringes upon the free exercise of his beliefs) because it was undisputed that Plaintiff could have eaten breakfast, which was served several hours before he began his fast at sunrise, and then saved food from his 10:00 lunch tray and 4:30 dinner tray

---

[8] When applying the *Turner* rational basis analysis, a court must consider whether:  (a) "there is a 'valid rational connection' between the prison regulation and the government interest justifying it"; (b) "there is an alternative means available to the prison inmates to exercise the right"; (c) "an accommodation would have 'a significant ripple effect' on the guards, other inmates, and prison resources"; and (d) "there is an alternative that fully accommodates the prisoner 'at de minimus cost to valid penological interests.'" *Murphy,* 372 F.3d at 982-83 (quoting *Turner,* 482 U.S. at 89-91); *see also Goff,* 362 F.3d at 549.

[9] As indicated previously, Defendant Toney believed that he was *not* legally required to grant Plaintiff's requests for commissary privileges or a post-sunset meal tray because those requests were made in conjunction with something the Muslim religion characterizes as "voluntary," rather than "mandatory." Both the United States Supreme Court and Eighth Circuit have made it clear that it is irrelevant whether a particular religious practice is mandated by the religion in question. Instead, the relevant inquiry is whether the prisoner's desire to engage in a particular practice is based upon his own, sincerely held religious belief. *See Thomas v. Review Bd. of the Indiana Employment Sec. Div.,* 450 U.S. 707, 715-16 (1981) (holding that "the guarantee of free exercise is not limited to beliefs which are shared by all of the members of a religious sect"); *Goff,* 362 F.3d at 547 (providing that the religious practice in question must be "based on" – but not mandated by – "sincerely held" religious beliefs); *Love v. Reed,* 216 F.3d 682, 687 n.9 (2000) (explaining that the relevant inquiry is whether the religious belief is "sincerely held," and not whether it is ecclesiastical law).  As previously explained, the undisputed testimony from Iman Muhammad was that many Muslims choose to fast voluntarily.

(which, undisputedly, contained medium to large portions of food) for consumption after he ceased his fast at sunset. Because Plaintiff had this reasonable option available to him, the Court finds that Defendant Toney's refusal to provide him with commissary privileges or a post-sunset meal tray did not "actually infringe" upon Plaintiff's religious beliefs.[10] Accordingly, the Court finds Plaintiff failed to demonstrate, by a preponderance of the evidence, that Defendant Toney violated his free exercise rights.

10     Finally, Plaintiff admitted that Defendant Hobbs' only personal involvement in this claim was affirming Defendant Toney's decision to deny Plaintiff's request for commissary privileges or a post-sunset meal tray. Because the Court finds Defendant Toney did not violate Plaintiff's free exercise rights when he made that decision, there is no factual or legal basis for Plaintiff's claim that, in denying his grievance, Defendant Hobbs also violated his free exercise rights.

11.    The Court finds that Plaintiff's free exercise claim against Defendants Toney and Hobbs is without merit. Therefore, the Court recommends that this claim be dismissed, with prejudice.

## G.    Plaintiff's First Amendment Free Exercise Claim Against Defendant Freyder

1.    ADC Policy 550 explains that inmates will be allowed to fast during the twenty-nine to thirty days of Ramadan, which is observed during the ninth lunar month. *See* Defendants' Exhibit 16, at § (1)(a) and (b). Within four days after the end of Ramadan, inmates are allowed to participate in Eid-ul-Fitr (hereinafter "Eid Feast"), which is a feast celebrating the completion

---

[10] Assuming, *arguendo*, that Plaintiff had satisfied the threshold inquiry, the Court would find that his free exercise claim fails under the *Turner* rational relation test because Defendant Toney's decision to deny Plaintiff's request for commissary privileges or a post-sunset meal tray was reasonably related to the legitimate penological interest of requiring Plaintiff to *earn* special privileges by engaging in good behavior that would allow him to proceed through the graduated levels of the incentive program.

of Ramadan. *Id.* ADC Policy 550 allows for the Eid Feast to be catered through private and inmate donations. *Id.* at § (3)(h) and (j). However, it also specifically provides that the Eid Feast meal may be prepared by the unit kitchen if the "Unit Warden feels that there are particular problems with costs, logistics, or security." *Id.* at § (3)(i). Finally, ADC Policy 550 states that inmates must celebrate the Eid Feast "under the conditions of their confinement." *Id.* at § (3)(e).

2.      Plaintiff testified that on November 20, 2002, he received a Memo from Defendant Charles Freyder, a non-denominational Chaplain at VSM, which stated that Plaintiff, as well as all other ADC inmates "in segregation," would be required to celebrate the "Breaking of the Ramadan Fast," on December 5, 2002, "under their conditions of their confinement." *See* Defendants' Exhibit 15. Plaintiff explained that, pursuant to Defendant Freyder's direction, he had to celebrate the Eid Feast by eating the regular evening meal tray that was provided to all VMS inmates. In contrast, Plaintiff claimed Muslim inmates in other ADC units received catered food trays on Eid Feast. However, Plaintiff was unable to explain to the Court how those catered food trays were different from the tray he received at the VSM.

3.      Defendant Freyder confirmed that Muslim inmates, who were not being held "in segregation" at other ADC units, received catered food trays on Eid Feast, while Plaintiff, as well as all other Muslim inmates in the VSM, received the regular food tray.[11] Defendant Freyder also testified that there are no special foods or quantities of food that a Muslim must consume on the Eid Feast. Instead, the meaning of Eid Feast comes from within the believer, and it is the spirit, intent, and state of mind in which the food is consumed that is important. For instance, Defendant Freyder explained that a Muslim can break the daily fasts of Ramadan simply by drinking a cup of water. Thus, Plaintiff could have engaged in the full celebration of Eid Feast

---

[11] All prisoners in VSM are held "in segregation," *i.d.*, each prisoner is incarcerated in a one-person cell for 23 hours each day. All meals are served to VSM prisoners in their cells.

simply by eating his regular VSM meal tray with the mind set and prayerfulness that is the essence of that religious holiday.

4.     The Court finds that Plaintiff had a sincerely held desire to participate in the Eid Feast, which is firmly based in Muslim teachings.[12] However, as with his previous free exercise claim, the Court finds that Plaintiff's Eid Feast claim fails the third part of the "threshold" inquiry (as to whether the government action actually infringes upon his free exercise of his beliefs) because it was undisputed that Plaintiff could have derived the full benefit of Eid Feast simply by consuming his regular VSM food tray in the spirit, mind set, and prayerfulness which is the essence of that the religious holiday.[13] Accordingly, the Court finds that Plaintiff has failed to demonstrate, by a preponderance of the evidence, that Defendant Freyder violated his free exercise rights.

5.     Because Plaintiff's free exercise claim against Defendant Freyder is without merit, the Court recommends that the claim be dismissed, with prejudice.

### III. Conclusion

For the foregoing reasons, the Court concludes that Plaintiff has failed to establish, by a preponderance of the evidence, that he is entitled to relief on *any* of the claims set forth in his

_____

[12] For a discussion of the applicable law, *see* section F, paragraph 9, of this Recommended Disposition at page 25.

[13] Assuming, arguendo, that Plaintiff had satisfied this threshold inquiry, the Court would find that his free exercise claim fails under the *Turner* rational relation test because Defendant Freyder's decision not to let Plaintiff have a catered food tray on Eid Feast was reasonably related to the legitimate penological interest of promoting safety in the VSM, which unquestionably, houses the most incorrigible and potentially dangerous inmates within the ADC. This is particular germane to Plaintiff, who has a history of keeping various contraband items in his cell. *See Goff*, 362 F.3d at 549 (holding that a prison's decision not to allow inmates in the lock down unit to have special food trays on a religious feast day of the "CONS" religion was rationally related to the legitimate penological interest in preventing contraband from being introduced into the unit); *Ochs v. Thalacker*, 90 F.3d 293, 296 (8th Cir. 1996) (recognizing that "institutional security" is "the most compelling governmental interest in a prison setting").

Complaint or Amended Complaint. *See* docket entries #2 and #6.

IT IS THEREFORE RECOMMENDED THAT Plaintiff's Complaint (docket entry #2) and Amended Complaint (docket entry #6) be DISMISSED, WITH PREJUDICE, and that Judgment be entered in favor of Defendants on all claims set forth in this § 1983 action.

Dated this 17TH day of May, 2005.

UNITED STATES MAGISTRATE JUDGE

**J. THOMAS RAY**
UNITED STATES MAGISTRATE JUDGE

(501) 604-5230
FAX# 604-5237

May 18, 2005

Mr. James Johnson, aka, Seifullah Aziz Ali Diaab
ADC #86885
East Arkansas Regional Unit
P.O. Box 180
Brickeys, AR 72320-0180

Ms. Susannah Catherine Raney
Arkansas Attorney General's Office
232 Center Street, Suite 2000
Little Rock, AR 72201-2610

      Re:    *James Johnson, aka, Seifullah Aziz Ali Diaab v. Gregory Y. Harmon, Warden,*
            *Arkansas Department of Correction, et al.*
            Case No. 5:03cv00468 JLH/JTR

Dear Mr. Diaab and Ms. Raney:

      Attached is a Proposed Findings and Recommended Disposition which has been prepared by this office and submitted to United States District Judge J. Leon Holmes.

      Any party may serve and file written objections to this recommendation. Objections should be specific, and should include the factual and legal basis for the objection. If the objection is to a factual finding, specifically identify that finding and the evidence that supports your objection. An original and one copy of your objections must be <u>received</u> in the office of the United States District Clerk no later than eleven (11) days from the date of this letter. A copy of any objections will be furnished to the opposing party.

      Failure to file timely objections may result in the waiver of the right to appeal questions of fact.

      If you object to the recommendation, and also desire to submit new, different, or additional evidence, and to have a hearing for this purpose before the District Judge, you must, at the same time that you file your written objections, include "A Statement of Necessity" that contains the following information:

      1.    Why the record is inadequate.

      2.    The details of any testimony desired to be introduced at the hearing before the District Judge in the form of an offer of proof, and a copy, or the original, of any documentary or other nontestimonial evidence desired to be introduced at the hearing before the District Judge.

From this submission, the District Judge will determine the necessity for an evidentiary hearing, either before the Magistrate Judge or the District Judge.

If you decide to file Objections and/or a "Statement of Necessity," please mail them to:

Clerk, United States District Court
Eastern District of Arkansas
600 West Capitol Avenue, Suite 402
Little Rock, Arkansas 72202-3325

The caption of your case and the case number must be included on the top of any document filed with the Clerk's Office.

Yours truly,

J. Thomas Ray
United States Magistrate Judge

Enclosure

cc:    Honorable J. Leon Holmes, United States District Judge
       File